229 F.2d 506
 James P. MITCHELL, Secretary of Labor, Appellant,
v.
COVINGTON MILLS, Inc., et al., Appellees.
James P. MITCHELL, Secretary of Labor, Appellant,
v.
ALABAMA MILLS, Inc., et al., Appellees.
NATIONAL ASSOCIATION OF COTTON MANUFACTURERS et al., Appellants,
v.
COVINGTON MILLS, Inc., et al., Appellees.
NATIONAL ASSOCIATION OF COTTON MANUFACTURERS et al., Appellants,
v.
ALABAMA MILLS, Inc., et al., Appellees.
TEXTILE WORKERS UNION OF AMERICA, CIO, Appellant,
v.
COVINGTON MILLS, Inc., et al., Appellees.
TEXTILE WORKERS UNION OF AMERICA, CIO, Appellant,
v.
ALABAMA MILLS, Inc., et al., Appellees.
 Nos. 12650-12655.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 29, 1955.
 Decided December 1, 1955.
 Petition for Rehearing In Banc Denied January 10, 1956.
 Writ of Certiorari Denied March 26, 1956.
 
 See 76 S.Ct. 546.
 Messrs. Stuart Rothman, Solicitor, Department of Labor, of the bar of the Supreme Court of Minnesota, pro hac vice, by special leave of Court, and Edward H. Hickey, Attorney, Dept. of Justice, with whom Asst. Atty. Gen. Warren E. Burger, Miss Bessie Margolin, Assistant Solicitor, Dept. of Labor, and Mr. William A. Lowe, Attorney, Dept. of Labor, were on the brief, for appellant in Nos. 12650 and 12651.
 Mr. Warren F. Farr, Boston, Mass., of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of Court, with whom Mr. John W. Cragun, Washington, D. C., was on the brief, for appellants in Nos. 12652 and 12653. Mr. Robert W. Barker, Washington, D.C., also entered an appearance for appellants in Nos. 12652 and 12653.
 Mr. David E. Feller, Washington, D. C., with whom Mr. Arthur J. Goldberg, Washington, D. C., was on the brief, for appellant in Nos. 12654 and 12655.
 Messrs. Whiteford S. Blakeney, Charlotte, N. C., of the bar of the Supreme Court of North Carolina, pro hac vice, by special leave of Court, and W. Glen Harlan, Atlanta, Ga., with whom Mr. Llewellyn C. Thomas, Washington, D. C., was on the brief, for appellees.
 Before EDGERTON, Chief Judge, and WASHINGTON and DANAHER, Circuit Judges.
 EDGERTON, Chief Judge.
 
 
 1
 The Walsh-Healey Public Contracts Act of 1936 provides that any government contract for more than $10,000 shall include a stipulation that all persons employed in manufacturing or furnishing goods under the contract will be paid "not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract; * * *." 41 U.S.C.A. § 35, 49 Stat. 2036, § 1.
 
 
 2
 The Secretary of Labor determined in January 1953, after extensive hearings, that the prevailing minimum wage in the Cotton, Silk, and Synthetic Textile Branch of the Textile Industry was $1.00 per hour.
 
 
 3
 Two separate groups of textile manufacturers brought separate suits against the Secretary, under § 10(b) of the Act, 41 U.S.C.A. § 43a(b), to set aside and enjoin his determination as illegal.[1] By permission of the District Court the Textile Workers Union of America, CIO, The National Association of Cotton Manufacturers, Berkshire Fine Spinning Associates, Inc., Fitchburg Yarn Company and Hathaway Manufacturing Company intervened as defendants in support of the determination. The cases were consolidated for hearing in the District Court. The court awarded summary judgment to all the plaintiffs and permanently enjoined the Secretary from putting the determination into effect as to any of them, on the ground that the Secretary's authority under the Walsh-Healey Act is limited by the word "locality" and that, therefore, he may not determine a minimum wage on an industry-wide basis. The Secretary and the intervenors appeal.
 
 
 4
 The policy and purpose of the Act are plain. By statute and regulation, government contracts must go to the lowest responsible bidder. Until the Walsh-Healey Act was passed, it followed that the government, though it urged industry to maintain adequate wage standards, was often compelled to undermine them by contracting with low-wage concerns. The Walsh-Healey Act sought to support standards by withholding contracts from such concerns. "This Act's purpose was to impose obligations upon those favored with Government business and to obviate the possibility that any part of our tremendous national expenditures would go to forces tending to depress wages and purchasing power and offending fair social standards of employment. As stated in the Report of the House Committee on the Judiciary * * *, `The object of the bill is to require persons having contracts with the Government to conform to certain labor conditions in the performance of the contracts and thus to eliminate the practice under which the Government is compelled to deal with sweat shops.'" Perkins v. Lukens Steel Co., 310 U.S. 113, 128, 60 S.Ct. 869, 877, 84 L.Ed. 1108. The Act's "purpose is to use the leverage of the Government's immense purchasing power to raise labor standards." Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 507, 63 S.Ct. 339, 342, 87 L.Ed. 424.
 
 
 5
 The Secretary's findings of fact make it clear that in the textile industry, unlike some industries, only an industry-wide minimum will serve this purpose, because the competition is industry-wide. The District Court's construction of the Act would make it necessary for the Secretary to fix separate minima according to the wages that prevail in each separate textile community. This would freeze the competitive advantage of concerns that operate in low-wage communities and would in effect offer a reward for moving into such communities. Obviously this would defeat the purpose of the Act. It would also make the Act nearly meaningless as applied to a large part of the textile industry, since there is frequently only one textile concern in one neighborhood and it necessarily pays the wages that prevail in its plant.
 
 
 6
 Because the Walsh-Healey Act uses the word "locality", the appellees say that the plain meaning of the Act forbids the Secretary to fix an industry-wide minimum. As to the "plain meaning" of an Act of Congress the Supreme Court has said: "When that meaning has led to absurd or futile results * * * this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one `plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words." United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345.
 
 
 7
 Moreover, it is not true that the plain meaning of the Walsh-Healey Act forbids the Secretary to fix an industry-wide minimum in this case. It is not plain that every minimum wage determination under the Act must be limited to a "locality". It is not even plain that a large group of States can never be a "locality".[2] The word occurs only in the phrase "currently operating in the locality".[3] The phrase is not plainly intended to qualify any other term than "groups of industries". It may or may not be intended to qualify "the particular or similar industries". It can hardly be intended to qualify "similar work", for "work * * * currently operating in the locality" would be a strange expression. The Secretary found that a dollar an hour is the prevailing minimum on "similar work". He also found that it is the prevailing minimum in the particular industry. In our opinion these findings were fully warranted.
 
 
 8
 The Secretary's interpretation of the Act as permitting industry-wide determinations of minimum wages is not new. In this industry and many others, during many years, the Secretary has made many such determinations. See, e. g., 41 C.F.R. Parts 202 et seq. His practice in this respect has repeatedly been called to the attention of committees of Congress. Attempts have been made to write his interpretation expressly into the Act. Attempts have also been made to write it expressly out of the Act. Both have failed. Congress has chosen to leave the interpretation of the Act to the Secretary and the courts. As the Supreme Court said in regard to a different but somewhat related statute, the Fair Labor Standards Act, [29 U.S.C.A. § 201 et seq.,] "We decline to repudiate an administrative interpretation of the Act which Congress refused to repudiate after being repeatedly urged to do so." Alstate Construction Co. v. Durkin, 345 U.S. 13, 17, 73 S.Ct. 565, 568, 97 L. Ed. 745.
 
 
 9
 Appellees point out that "purchases of such materials, supplies, articles, or equipment as may usually be bought in the open market" are exempt from the statutory requirement of a stipulation that employees will be paid not less than the prevailing minimum determined by the Secretary. 41 U.S.C.A. § 43, 49 Stat. 2039, § 9. But this exemption has nothing to do with the only matter here in issue, which is the validity of the Secretary's determination. The Secretary determined nothing with regard to the exemption. He determined that "The minimum wage for persons employed in the manufacturing or furnishing of the products of the Cotton, Silk, and Synthetic Textile Branch of the Textile Industry under contracts subject to the Walsh-Healey Public Contracts Act shall be $1.00 an hour arrived at either on a time or piece-rate basis." He did not undertake to decide to what contracts the Walsh-Healey Act, and therefore the minimum wage determination, are applicable. The complaints in these suits do not ask the court to decide that question.[4]
 
 
 10
 In our opinion the plaintiffs' other objections to the Secretary's determination are likewise invalid.
 
 
 11
 The District Court thought it need not rule on a motion of the Secretary to dismiss the complaints, on jurisdictional grounds, as to 144 of the 158 plaintiffs. But the fact that some of the plaintiffs clearly have standing, under the Fulbright Amendment, to seek review of the Secretary's determination, confers no standing on others. We think the District Court should decide, in the first instance, which plaintiffs have standing. Cf. B. F. Goodrich Co. v. Federal Trade Commission, 93 U.S.App.D.C. 50, 56, 208 F.2d 829, 834. The case is remanded with instructions to rule on the motion to dismiss, unless the government withdraws it or the plaintiffs concerned consent to it. As against plaintiffs who are not dismissed, judgment should be entered for the defendant.
 
 
 12
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Before its effective date, the determination was stayed as to the plaintiffs and the Secretary was temporarily enjoined from putting it into effect as to them. While that order was in force, any plaintiff who entered into a contract otherwise subject to the determination was required to post a bond to pay the prescribed wage if the determination were upheld. We entered a somewhat similar order, requiring a bond of $2,000, pending the present appeal
 
 
 [2]
 In Lukens Steel Co. v. Perkins, 70 App. D.C. 354, 107 F.2d 627, this court expressed a different view. But the Supreme Court reversed the judgment of this court, and affirmed the judgment of the District Court dismissing the complaint, on the ground that the plaintiffs had no standing to sue. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. This of course left the opinion, as well as the judgment, of this court without value as a precedent
 
 
 [3]
 It has been suggested that the words "in the locality" are not necessarily tied to the words "currently operating", and that "similar work * * * in the locality" is a possible reading. But since it is by no means the only possible reading it is not the "plain meaning" of the Act
 
 
 [4]
 It is therefore immaterial that the Fulbright Amendment to the Walsh-Healey Act provides that review of the "applicability" of a minimum wage determination may be had by any "person adversely affected or aggrieved". 66 Stat. 308, 41 U.S.C.A. § 43a(b)
 The Fulbright Amendment also provides that "Notwithstanding the inclusion of any stipulations required by any provision of sections 35-45 of this title in any contract subject to said sections, any interested person shall have the right of judicial review of any legal question which might otherwise be raised, including, but not limited to, wage determinations and the interpretation of the terms `locality', `regular dealer', `manufacturer', and `open market'." 41 U.S.C.A. § 43a(c). That is, a contractor who has been required to include a minimum wage stipulation in a contract need not perform the stipulation if the requirement was not in accordance with law. This is irrelevant here.
 DANAHER, Circuit Judge (concurring).
 I concur in the entire opinion by Chief Judge EDGERTON.
 I feel impelled to say this: were it not for Textile Workers Union of America, CIO v. Allendale Company,[1] I would dismiss 144 plaintiffs on the present record. Moreover, I believe the District Court should have denied intervention by defendants National Association of Cotton Manufacturers, Berkshire Fine Spinning Associates, Inc., Fitchburg Yarn Company, Hathaway Manufacturing Company and the Textile Workers Union of America, CIO, who are now here as appellants on the side of the Secretary. The Supreme Court held[2] in 1940 that determinations by the Secretary under the Walsh-Healey Act[3] as it then was written, are not judicially reviewable. The Act "was not intended to be a bestowal of litigable rights upon those desirous of selling to the Government; it is a self-imposed restraint for violation of which the Government — but not private litigants — can complain."[4] The function of the Secretary, acting in behalf of the Government, is to find the facts,[5] and make his determination which shall be conclusive upon all agencies of the United States. The Act was designed to permit the Government to supply its needs without the delays necessarily incident to judicial supervision of administrative procedure. "If the general law permits prospective bidders to challenge each wage determination of the Secretary in the courts, by a like token all employees affected could obtain judicial review."[6] We have been advised that "Courts should not, where Congress has not done so, subject purchasing agencies of the Government to the delays necessarily incident to judicial scrutiny at the instance of potential sellers, which would be contrary to traditional governmental practice and would create a new concept of judicial controversies."[7] Not only do such expressions by the Court correctly, in my opinion, reflect the understanding and purpose of the Congress, but this case illustrates peculiarly the situation which Congress sought to avoid. It is now nearly three years since the Secretary's determination was promulgated, and it is no more nearly effective now than when it was first made. Yet 144 plaintiffs and 5 defendants as "parties" in the District Court still, because of their status as parties, respectively have rights of appeal no matter which way our order goes.[8]
 It is said that these "parties" are thus able completely to frustrate the reasonable fulfillment of the Congressional objective because "rights" have been conferred upon them by the Fulbright amendment,[9] adopted in 1952. In terms it was provided that review "may be had within 90 days after such determination is made," and ten of the original plaintiffs sought review after the 90 day statutory period had expired. As to them the motion to dismiss should be granted. The Fulbright amendment further provided that review was to be had only "by any person adversely affected or aggrieved" by the determination. Only 14 plaintiffs have made a showing that the determination "results in direct and immediate injury."[10] So, I would dismiss as to 144 "plaintiffs," leaving only the 14 in the Alabama case and none in the Covington case. The named intervening appellants by the Secretary's determination have not been subjected to or threatened with any legal wrong. They have shown no independent legal right. They are not "private Attorney Generals,"[11] and the Secretary is ably represented here by the Attorney General. Even the Fulbright amendment confers no standing upon those who appear on the side of the Secretary. I believe their intervention never should have been allowed.
 This is not a case involving a determination of public convenience and necessity such as National Coal Ass'n v. Federal Power Commission.[12] This is not a case like Columbia System v. United States,[13] where "the regulations purport to operate to alter and affect adversely appellant's contractual rights and business relations with station owners whose applications for licenses the regulations will cause to be rejected and whose licenses the regulations may cause to be revoked." This is not a case like Associated Industries v. Ickes,[14] where by administrative order, the minimum prices at which coal could be sold were increased, thus affecting the very basis upon which transactions in the coal business could be conducted. Nor is the case like United States Cane Sugar Refiners' Ass'n v. McNutt,[15] or Longshoremen's Union v. Boyd,[16] where the suit was dismissed for want of a "`case or controversy.'" This is a case, sui generis, where "Congress, as incident to its power to authorize and enforce contracts for public works, may require that they shall be carried out only in a way consistent with its views of public policy . . .."[17] No one is forced to bid for Government contracts. Not foreign to our problem are the considerations reasoned by this court in Alabama Power Co. v. Ickes.[18] I believe the Congressional interest in the attainment of the objectives of the Walsh-Healey Act and the Government's undoubted right to lay down the conditions upon which its own business will be conducted compel a strict construction of the Fulbright amendment. Any other view makes a shambles of the Walsh-Healey Act, for the delays and confusion occasioned by the hordes of "parties" render a determination obsolete and ineffective. Thus those who properly may be parties are those, and only those, who can show themselves by direct and immediate injury to have been adversely affected or aggrieved by the Secretary's determination.
 Notes:
 
 
 [1]
 96 U.S.App.D.C. 401, 226 F.2d 765. But see the dissenting opinions
 
 
 [2]
 Perkins v. Lukens Steel Co., 1940, 310 U.S. 113, 128, 60 S.Ct. 869, 84 L.Ed. 1108
 
 
 [3]
 49 Stat. 2036-2040 (1936), as amended, 41 U.S.C.A. §§ 35-45
 
 
 [4]
 Supra note 2, 310 U.S. at page 127, 60 S.Ct. at page 877
 
 
 [5]
 § 4, 49 Stat. 2038 (1936), as amended, 41 U.S.C.A. § 38; (re the fact-finding function see Shannahan v. United States, 1938, 303 U.S. 596, 599, 58 S.Ct. 732, 82 L.Ed. 1039)
 
 
 [6]
 Supra note 2, 310 U.S. at page 131, 60 S.Ct. at page 879
 
 
 [7]
 Id. 310 U.S. at page 130, 60 S.Ct. at page 878
 
 
 [8]
 Cf. Fishgold v. Sullivan Corp., 1946, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230; Boston Tow Boat Co. v. United States, 1944, 321 U.S. 632, 633, 64 S.Ct. 776, 88 L.Ed. 975
 
 
 [9]
 41 U.S.C.A. § 43(a)
 
 
 [10]
 National Coal Ass'n v. Federal Power Commission, 1951, 89 U.S.App.D.C. 135, 138, 191 F.2d 462, 465
 
 
 [11]
 Associated Industries v. Ickes, 2 Cir., 1943, 134 F.2d 694, 704, order vacated, 1943, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414. The able opinion by Judge Frank treats of almost every conceivable situation except that presented on the record here
 
 
 [12]
 Supra note 10. (Even there Judge Clark, in his dissent, argued well that the petitioners were not "parties aggrieved" within the meaning of the Natural Gas Act, 15 U.S.C.A. § 717 et seq.)
 
 
 [13]
 1942, 316 U.S. 407, 422, 62 S.Ct. 1194, 1203, 86 L.Ed. 1563
 
 
 [14]
 Supra note 11
 
 
 [15]
 2 Cir., 1943, 138 F.2d 116 (where the petition was dismissed for lack of jurisdiction)
 
 
 [16]
 1954, 347 U.S. 222, 74 S.Ct. 447, 448, 98 L.Ed. 650. (The point is certainly present here.)
 
 
 [17]
 Ellis v. United States, 1907, 206 U.S. 246, 256, 27 S.Ct. 600, 601, 51 L.Ed. 1047
 
 
 [18]
 1937, 67 App.D.C. 230, 91 F.2d 303, affirmed 1938, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374
 WASHINGTON, Circuit Judge (dissenting).
 The central issue here, of course, is whether the Walsh-Healey Act was intended to establish a nation-wide wage standard for Government contractors, or a standard based on wages prevailing in the contractor's own community. To my mind the language of the statute clearly establishes the latter standard. This court so held in a case decided shortly after the passage of the Act. Lukens Steel Co. v. Perkins, 1939, 70 App. D.C. 354, 107 F.2d 627. The opinion — an exhaustive one — was written by Associate Justice Justin Miller, and was concurred in by Associate Justice Fred M. Vinson, who had become a member of this court after serving in Congress during the very period in which the Walsh-Healey Act was passed. The reasoning of the opinion seems to me unanswerable. And the legislative history there recited shows with complete clarity what Congress intended: that bidders for Government contracts "shall pay the prevailing wages in the community where the work is performed."[1]
 Our decision in Lukens was reversed by the Supreme Court on another ground — that the complainants lacked standing to sue. Perkins v. Lukens Steel Co., 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. The obstacle has now been removed by the Fulbright Amendment, passed in 1952. 41 U.S.C.A. § 43a. Technically, in dealing with the present case, we are not "bound" by our decision in Lukens, even though the Supreme Court did not reach the merits of that case. But its reasoning remains sound, and has not been disturbed by anything which has happened since. As far as the argument based on continued administrative interpretation is concerned, I would suppose that we were not entitled to give much weight to action which was until a short time ago completely immune to judicial review. Nor, under the circumstances here, does congressional failure to amend an act already clear on its face seem to be in any sense declaratory of the correctness of the Secretary's interpretation. The latest pronouncement of Congress — the Fulbright Amendment — certainly makes no such declaration: its passage might suggest, indeed, that Congress was not content with the Secretary's action, and wished it to be reviewed by the courts. The relevant Committee Report specifically states that failure to amend the "locality" provision of the Act is to be without prejudice to a judicial determination of the meaning of that provision. S.Rep. No. 1599, 82d Cong., 2d Sess. 31 (1952).
 It is argued that to give the "locality" provision its ordinary meaning would produce an undesirable result. But — whether or not that is so — our function is to determine what Congress thought desirable, rather than to give expression to our own views on social legislation. It is also said that the purpose of the Act would be defeated by such an interpretation. But I think the majority misconceives the purpose of the Act, as revealed in the light of conditions prevailing in 1936, when it was passed. At that time, and before, it was generally thought that the Federal Government lacked power to undertake broad regulation of wages and labor standards. Control of Government contracts was thought possible, however, and in 1931 the Bacon-Davis Act was passed, imposing certain wage regulations in the field of Government construction contracts, 40 U.S.C.A. § 276a et seq., 46 Stat. 1494. In 1935 that Act was substantially revised and strengthened, 49 Stat. 1011. The 1935 revision provided — in language derived from the earlier legislation — for wage determinations based on conditions prevailing in the "city, town, village, or other civil subdivision" where the contract is to be performed. In 1936 the Walsh-Healey Act was passed to cover the field of supply contracts. Here Congress used the "locality" provision we have been discussing. Obviously both acts are based on the same philosophy and point to a standard limited to a fairly small area and to a restricted objective: that of preventing contractors from cutting wages below prevailing community levels in an effort to pare costs and thus be the lowest bidder. As the legislative history shows, there was no thought of raising wages, or of eliminating regional differentials. See Lukens at page 362 of 70 App.D.C., at page 635 of 107 F.2d.
 Later, of course, greater breadth of Federal power was recognized. The Supreme Court's decision in National Labor Relations Board v. Jones & Laughlin Steel Co., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, opened the door to more sweeping congressional action. Problems such as that of the "runaway industry," which were not intended to be dealt with by the Walsh-Healey Act, but which may underlie the Secretary of Labor's approach to that Act, may now be dealt with by explicit Federal legislation. Congress has gone far in this direction through the Fair Labor Standards Act and its amendments. Indeed, under an amendment shortly to come into effect, the minimum F.L.S.A. wage will be raised to a dollar an hour. Public Law 381, 84th Cong., 1st Sess. § 3 (1955), U. S. Code Congressional and Administrative News 1955, p. 814. That, of course, is the same as the Secretary's determination here. Surely it is better to reach decisions of that sort through congressional debate and action, rather than through strained administrative and judicial interpretation of a statute passed years ago for a different and more limited purpose.
 Notes:
 
 
 [1]
 Congressman Greenwood at 80 Cong. Rec. 9993; quoted at page 362 of 70 App.D.C., at page 635 of 107 F.2d, together with numerous similar statements