The UNITED STATES of America,
Plaintiff,

v.

WESTLAND OIL COMPANY, a corporation, Defendant.

Civ. No. 236.

United States District Court
D. North Dakota,
Northwestern Division.

April 14, 1964.

John O. Garaas, U. S. Atty., Fargo, N. D., and Harper Barnes, office of the Solicitor, United States Dept. of Labor, Kansas City, Mo., for plaintiff.

Hugh McCutcheon, Bosard, McCutcheon & Coyne, Minot, N. D., and Howard C. Burton, Great Falls, Mont., for defendant.

RONALD N. DAVIES, District Judge.

This is an action by the United States against Westland Oil Company, a corporation, for recovery of liquidated damages claimed to be due by reason of alleged violations of 41 U.S.C.A., § 35 et seq., 49 Stat. 2036, as amended, the Walsh-Healey Act.

A stay order was entered by this Court pending completion of previously initiated proceedings under the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., and the filing in this court of the entire record. This has been done and the United States has now moved for summary judgment against Westland pursuant to Fed.R.Civ.P. 56.

Westland owns a refinery at Williston, North Dakota, where it manufactures petroleum products. Crude petroleum is secured from independent oil producers under contracts whereby Westland purchases the entire output of certain wells. The contracts provide that title to the crude does not vest in Westland until it passes the outlet flange of storage tanks located at the wells. Westland is obligated to purchase all crude in the tanks, and the well owners are obligated to sell all such crude to Westland. Although the well owners are usually paid for the crude only after Westland has

taken possession, payment has been made for crude in the tanks after they were gauged and padlocked.

Westland customarily retains on hand a stock of raw, semi-processed and fully processed petroleum products which it stores at the refinery and at bulk stations it owns. During the refining processes additional products of the same kind are produced and commingled with the existing stocks as to be no longer identifiable.

The output of the refinery is not sufficient to meet sales demands of petroleum products, and so purchases are made from other independent refineries. In 1957 outside purchases constituted forty per centum (40%) of Westland sales but declined to about ten per centum (10%) at the time of the administrative proceedings. Outside purchases and product exchanges are standard practice in the industry.

This was the situation in 1957 and 1958 when Westland bid and was awarded three Armed Services Procurement (ASP) contracts [1] for the delivery of petroleum products to the Government. During the period of time necessary to fulfill the requirements of the contracts, truck drivers were employed by Westland to transport crude oil from the storage tanks located at the wells to the refinery and semi-processed and processed petroleum products from the refinery to the bulk stations.[2] These drivers were paid a fixed rate per mile although they worked in excess of eight hours a day and forty hours a week. The Government claims the drivers should have received extra compensation at one and one-half times their regular rates of pay for such excess hours even though ninety-eight and one-half per centum (98½%) of Westland's sales were to private consumers and only one and one-half per centum (1½%) of its sales were to the Government under the ASP and GS contracts. This is so since there was a failure to segregate time spent in performance of non-government work from work relating to the contracts, and this raises the presumption under Section 201.501(c) of the Regulations that all time was spent in fulfilling the Government contracts.

On the date of award of the ASP contracts, with the exception of ASP 18222, Westland had on hand, either at the refinery or bulk stations, sufficient product to fulfill each contract in its entirety and retain on hand at such places during the entire life of each contract sufficient product to fulfill the entire balance due. On the award date of ASP 18222, Westland had on hand sufficient product at well heads, in transit and at the refinery, to completely fulfill the contract.

Westland asserts as a defense, as it did in the administrative proceedings, an exception under Section 24, Rulings and Interpretations No. 3, issued by the Secretary as provided under the Act. Section 24 provides that:

"(a) A person may fulfill a contract subject to the Public Contracts Act by supplying materials or articles which were manufactured or produced prior to the award of the contract. The Act does not apply retroactively to work performed prior to the award of the contract, but the Act does apply to work performed after the date of the award of the contract on the materials or articles supplied to the Government.

"(b) However, when a contractor at the time of the award of a contract has on hand a stock of finished articles, partially finished articles, or raw materials and during the performance of the contract produces additional goods of the same kind which are added to the stockpile and commingled with them so as to be unidentifiable from the existing stock previously on hand, those employees engaged in such additional production during the per-

---

1. General Services Administration (GS) contracts originally involved were disposed of in the administrative proceedings and are not in issue here.

2. The issues raised concerning truck drivers who transported petroleum products directly from the refinery to the Government and from bulk stations directly to the Government were also disposed of in the administrative proceedings.

formance of the contract are not covered by the Act if all of the following factors are present:

"(1) The contractor customarily maintains a stockpile of materials, whether raw, semiprocessed or finished, which is unidentifiable as to the time work was performed on any particular unit in the pile;

"(2) Such a stock pile is, at the time of the award and at all times while the contract is in effect, sufficient to fulfill the remaining demands under the Government contract; and

"(3) The contract is in fact filled from that very pile.

"(c) If these conditions are met, it is not regarded as significant that some unidentifiable part of the goods taken from the pile and used to fill the Government contract was produced after the award of the Government contract. On the other hand, if the goods added to the stock are identifiable as having been produced after the date of the award of the Government contract and such goods are furnished to the Government, employees engaged in their production would be covered by the Act.

"(d) In any event, even though a contractor meets the three tests outlined above, he must nevertheless show compliance with the stipulations as to employees who perform work on the articles supplied to the Government at all stages beyond the stock pile. For example, employees who remove articles from the stock, and employees who perform any subsequent work such as further processing of the goods, or inspecting, labeling, packing, or crating the finished articles, are subject to the stipulations."

At the administrative proceedings before the Hearing Examiner, counsel for the Government conceded that the stocks of crude, refined or semi-processed petroleum held above ground at well heads, in storage at the refinery, or in storage at the bulk plants, properly constituted Westland's stock pile, but the Examiner rejected the claimed exemption on the basis that Westland had not complied with Section 24(b) (3) in that outside purchases had, in part, by direct shipment to the Government, been used to fulfill the ASP contracts.

In reviewing the Hearing Examiner's findings and conclusions, the Administrator affirmed the conclusion that the stock pile defense was not available where outside purchases which never entered into the Defendant's stock pile were directly used to partially fulfill the requirements of the ASP contracts. The Administrator further held in considering the GS contracts, that when an oil refiner contracts with the Government for delivery of semi-processed and processed petroleum products, it is not entitled to combine, for the purposes of asserting the stock pile defense, stocks of crude petroleum with stocks of semi-processed or processed petroleum, and remanded the proceedings to the Hearing Examiner for further consideration of the stock pile defense to the GS contracts.

The Hearing Examiner again held that the stock pile defense as applied to the ASP contracts was defeated by the direct delivery to the Government of outside purchases, but that the GS contracts met the requirements of Section 24(b). *The Examiner then went beyond the Administrator's direction on remand,*[3] and held that Westland did not meet the standard imposed by Section 24(b) (2) of Rulings and Interpretations No. 3 because without the crude stored at the well heads, the stock pile was not sufficient to meet the requirements of the ASP contracts.

To avoid further confusion, consideration will be given to both aspects of the

3. "This proceeding was remanded by me in a decision filed November 7, 1961, directing the Hearing Examiner to determine the application of the stockpile rule (Rulings and Interpretations No. 3, section 24), insofar as it applied to three contracts numbered GS–06S–4695, GS–06S–4129 and GS–06S–5182." The case was remanded solely for this purpose.

stock pile exemption as applied to the ASP contracts under the facts of this case.

There is no stated basis for the Examiner's finding on remand that "with deletion of crude at the wellheads from the stockpile, the respondent (Defendant Westland) did not meet the standard imposed by Section 24(b) (2) of Rulings and Interpretations No. 3 because without this crude stored at the wellheads, the stockpile was not sufficient."

The original finding in this respect was that "On the date of award of each of the contracts but ASP 18222, the respondent (Defendant Westland) had on hand, at its refinery and at the eleven bulk plants utilized to supply Government installations, sufficient product to fulfill each contract in its entirety, and retained on hand at such places, during the entire life of each contract, sufficient product to fulfill the entire balance due thereunder." Crude stored at the well heads was considered by the Examiner to be part of the stock pile only for ASP 18222.

Giving a literal interpretation to 24(b) (1) of Section 24, it is obvious that Westland's stock pile consisted of "finished articles, partially finished articles, or raw materials," and that it customarily maintained a stock pile of materials "whether raw, semi-processed or finished."

■ ■ Although the interpretations by the Administrator of the Rules and Regulations promulgated by the Secretary are entitled to great weight, they are not binding on the Court, and this is especially true when the Rules and Regulations are given a strained construction as was the case here. The Administrator's construction of Section 24 to mean that "when an oil refiner contracts with the Government for the delivery of semi-processed and processed petroleum, it is not entitled to combine, for purposes of asserting the stockpile defense, stocks of crude petroleum with stocks of semi-processed or processed petroleum" was far too narrow under the circumstances here present.

For the stated reasons, Westland's stock pile met the requirements of Section 24(b), 24(b) (1) and 24(b) (2); and it is, therefore, unnecessary to consider whether the stipulation of counsel as to what constituted Westland's stock pile was binding on the Administrator.

■ The final issue for determination is whether the stock pile exemption was defeated by the use of outside purchases to fulfill a portion of the requirements of the ASP contracts since Section 24(b) (3) required that the contracts be filled from Westland's stock pile.

Westland's sales to Government installations under both the ASP and GS contracts were only one and one-half per centum (1½%) of all sales. Of this one and one-half per centum (1½%)—which would be considerably less after deletion of the GS contract requirements—only 43 loads were delivered by Westland's drivers directly to Government installations from outside purchases and product exchanges to fulfill a portion of ASP 17368. Outside purchases and product exchanges used to partially fulfill contracts ASP 18222 and ASP 20444 were transported by common carriers. From this the Examiner concluded that Westland had not met the requirements of Section 24(b) (3), and that, therefore, all of Westland's drivers employed during the life of all the ASP contracts were entitled to overtime compensation. The Administrator affirmed, holding that Westland would not have lost the benefit of the section if it had merely added outside purchases to the stock pile and then filled the contracts from the stock pile, but that the direct delivery of outside purchases to the Government defeated the exemption.

■ The purpose of the Act is to use the leverage of the Government's immense purchasing power to raise labor standards, Ruth Elkhorn Coals, Inc. v. Mitchell, 101 U.S.App.D.C. 313, 248 F. 2d 635, certiorari denied, 355 U.S. 953, 78 S.Ct. 539, 2 L.Ed.2d 530; but this does not mean abandonment of common sense and practical considerations of practices in the oil industry.

To hold that Westland would not have lost the benefit of Section 24(b) if it had merely added outside purchases to its

stock pile, and then filled the contracts from the stock pile instead of using outside purchases directly to fulfill the requirements of the contracts, does not appear to this Court to be in accord with the clear intent of the Congress in passing the Act.

Where product exchanges and outside purchases are standard in the industry, it is far too harsh an interpretation to hold that the entire exemption is lost for a technical violation, when the loss of the exemption affects all of Westland's truck drivers over the life of all the ASP contracts when only a few were involved in delivering products from outside sources.

If Westland can establish what employees were engaged in deliveries of products from outside sources to the Government facilities, and the number of hours each were so engaged, it is entitled to assert the stock pile exemption as a defense.

The Government's motion for summary judgment against the Defendant Westland Oil Company, a corporation, must be, and it is hereby in all things denied.